1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES LEE, | ) 1:04-cv-5584-SMS |
| | ) |
| Plaintiff, | ) DECISION AND ORDER ON SOCIAL |
| | ) SECURITY COMPLAINT (DOC. 1) |
| | ) |
| v. | ) ORDER DIRECTING REMAND PURSUANT |
| | ) TO SENTENCE FOUR of 42 U.S.C. § |
| JO ANNE B. BARNHART, | ) 405(g) |
| Commissioner of Social | ) |
| Security, | ) ORDER DIRECTING THE CLERK TO |
| | ) ENTER JUDGMENT FOR PLAINTIFF |
| Defendant. | ) JAMES LEE AND AGAINST DEFENDANT |
| | ) JO ANNE B. BARNHART |
| | ) |

Plaintiff is represented by counsel and is proceeding with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB), and supplemental security income (SSI) benefits under Titles II and XVI of the Social Security Act (Act). Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the Magistrate Judge to conduct all proceedings in this matter, including ordering the entry of final judgment.[1] The matter is

---

[1] On August 10, 2004, the District Judge signed an order assigning the case to the Magistrate Judge for all purposes.

currently before the Court on the parties' briefs, which have
been submitted without oral argument to the Honorable Sandra M.
Snyder, United States Magistrate Judge.

PRIOR PROCEEDINGS

I. <u>Present Proceeding</u>

On February 28, 2001, Plaintiff filed applications for SSI
benefits under Title XVI of the Act and DIB under Title II of the
Act, alleging disability beginning on April 15, 1998. (A.R. at
110-12, 584-86.) Plaintiff's claim for disability based on back
injury, post traumatic stress disorder, anger and anxiety, and
depression was denied initially and on reconsideration. (<u>Id.</u> at
91-94, 96-100, 587, 589.) Plaintiff requested a hearing before an
administrative law judge (ALJ) of the Social Security
Administration (SSA). On July 25, 2002, Plaintiff appeared with
an attorney and testified before the ALJ, James P. Berry. (<u>Id.</u> at
17.) On August 22, 2002, the ALJ denied Plaintiff's application
for benefits. (<u>Id.</u> at 17-21.) Plaintiff requested review of the
ALJ's decision by the Appeals Council. (<u>Id.</u> at 12-13.) On January
23, 2004, the Appeals Council denied Plaintiff's the request for
review. (<u>Id.</u> at 7-9.)

On April 16, 2004, Plaintiff filed the complaint in the
instant action. Defendant filed the administrative record on
August 4, 2004. On December 13, 2004, Plaintiff filed an opening
brief. On February 15, 2005, Defendant filed a brief in
opposition. On March 9, 2005, Plaintiff filed a reply brief.

B. <u>Previous Proceeding</u>

Plaintiff had previously applied for SSI and DIB benefits on
April 20, 2000, alleging disability beginning alleging disability

beginning on April 15, 1998, and December 23, 1997, respectively. (A.R. at 103-06, 579-82.) Those applications were denied by an initial administrative determination dated August 16, 2000, to the effect that Plaintiff's back injury was not disabling, and that Plaintiff was able to perform light work with restriction to climbing, stooping, kneeling, crouching, or crawling for no more than one-third of a normal eight-hour work day. (A.R. at 86-90, 68-69, 583.) There is no indication in the record before the Court that Plaintiff sought reconsideration of that decision or that any other proceedings took place that would have affected the finality of that decision.

<u>ISSUES PRESENTED</u>

1) Whether the ALJ was biased;

2) With respect to Plaintiff's testimony, whether the ALJ's credibility findings were sufficient and were supported by substantial evidence;

3) Whether the ALJ erred by not considering the assertions of other parties;

4) Whether the ALJ's decisions at steps two and three of the sequential evaluation, were supported by substantial evidence, were made pursuant to legally correct standards, and were articulated by legally adequate findings;

5) Whether the ALJ erred in failing to develop the mental health record;

6) Whether the ALJ's RFC was supported by substantial evidence; and

7) Whether the ALJ's finding that Plaintiff could perform his past relevant work was supported by substantial evidence.

<u>FACTS</u>[2]

I. <u>Plaintiff's Testimony</u>

Plaintiff, born on August 27, 1950, was fifty-one at the time of the hearing, right-handed, five feet ten inches tall and 215 pounds, was married, and lived with his wife. He was able to drive and had a GED. (A.R. at 36-37.)

Plaintiff had back surgery in May 1999, which improved his back problem by allowing him to walk; however, he suffered constant pain that felt like someone was squeezing his back and pushing it down. He also suffered pain that radiated intermittently down his left leg to his knee, and occasional numbness, if he walked and stood too much. He still got a lot of swelling around the point of incision; he used ice for swelling once a week. (<u>Id.</u> at 38-40.)

Plaintiff was diagnosed with PTSD in November 1996; he was trying to see a psychiatrist but could not afford one and had to wait in the VA program. He had not been given any medications since 1996. (<u>Id.</u> at 44-45.)

Plaintiff injured his left hand in 1980 on a construction job when a steel band went into his wrist and cut the nerves. He could not close it and experienced cramps and difficulty doing small things with his left hand. He had talked to his doctor about it in the last several years but was told it was nerve damage about which nothing really could be done. He had surgery in 1980 for it to tie some nerves back or something. (A.R. at 44-46.)

---

[2] Plaintiff's brief omits a summary of the pertinent facts and testimony, and thus it fails to comply with the pertinent provisions of this Court's scheduling order.

Plaintiff had dermatitis and stomach problems; he was still taking medication that was keeping his esophagus in check. (Id. at 46.)

Plaintiff could stand forty-five minutes and walk about 100 feet; he could walk at most 400 feet in an eight-hour period. He did not use an assistive device but wore a back brace at all times. He could sit for about a half hour before his leg started tingling. He could lift and carry ten pounds. He spent about five hours a day reclining with his legs up. He spent two hours a day on his feet, working around the house. He could sit four hours in an eight-hour period. He stopped physical therapy in December 1999, and he did not do any type of stretching or exercise because it hurt and because he would think about when he could not walk. (Id. at 40-44, 56-58.) He dressed himself, did things around the house such as washing dishes several times a week, sweeping the kitchen twice a week, making his bed daily, vacuuming part of the house twice a week, and sweeping and washing the floor twice a week. Bending and moving made him tighten up, so he relaxed after sweeping a bit. (A.R. at 46-48.) He watched television for enjoyment about eight hours a day; he did not visit with family or attend church because he did not like being around people. About once a month he accompanied his wife shopping, but there was too much walking. (A.R. at 51-52.)

His PTSD caused him to see his friend being blown over the ship off the aircraft carrier; it would just take over, and he did not know why it was worse. (Id. at 48.)

In addition to reclining and using a back brace, he took medication (nerve pills and Vicodin) and lay down in bed for an

5

hour and a half at a time when things tightened up. His medication gave him some relief, but he suffered constipation from the Vicodin. (<u>Id.</u> at 40-42.)

He tried to self-medicate with drinking and drugs for nightmares and PTSD; he drank three or four beers every other day or whenever he could get one, and he had used cocaine provided by friends once a week for about a year. It helped his PTSD but interfered with his ability to work because it made him less sharp (A.R. at 49-50, 56.)

He took Albuterol inhalant daily for breathing problems, and he had taken pills for congestion. When he was exposed to irritants or pollutants such as grass, dust, or smoke, it increased his breathing problems. (A.R. at 53-54.)

Plaintiff last worked in March 1998 as a liquor merchandiser, a position he had held for six years. His doctor had put him on light duty, but the employer did not have a light-duty position; if one had been available, he would have tried to do it, but he could not have lifted twenty pounds occasionally and ten pounds frequently and been on his feet six hours a day. (A.R. at 38, 56-58.) He received $25,000.00 in settlement of a worker's compensation claim in 2000. (A.R. at 55.)

II. <u>Testimony of the Vocational Expert</u>

Jose Chaporo, a rehabilitation counselor, testified as an VE pursuant to stipulation. Pursuant to Plaintiff's explanations of his work as performed in the past, Plaintiff's past work as an auto mechanic, which involved changing oil and checking fluids, was functionally the position of auto mechanic helper, unskilled, typically light work involving lifting twenty pounds at most. His

1  past work of cashier-checker was light, semi-skilled; his work in
2  a liquor store was as a demonstrator, which was usually light and
3  semi-skilled, and it had involved lifting thirty pounds
4  frequently. (Id. at 60-62.) Plaintiff had transferable skills of
5  operating the cash register, knowing prices, exchange of money,
6  and customer service; further, the demonstrator involved setting
7  up displays in a store. (Id. at 63.)

8  The VE testified that someone of Plaintiff's age and
9  educational background who could lift twenty pounds occasionally
10 and ten pounds frequently, stand, walk, and sit six of eight
11 hours, and could occasionally stoop and crouch could perform the
12 cashier/checker position. If the abilities changed to lifting and
13 carrying ten pounds occasionally and frequently, standing two and
14 one-half hours total, walking 400 feet total, and sitting four
15 hours total, with occasional bending, the person could not
16 perform any of Plaintiff's past relevant work. (Id. at 63-64.)

17 III. Medical History

18 Dr. Timothy Martin opined that an MRI of Plaintiff's lumbar
19 spine completed on May 11, 1998, showed mild disc deterioration
20 at L2-3 and L3-4 levels, with mild to moderate left neural
21 foraminal stenosis at L3-4; far left lateral disc protrusion at
22 the L4-5 level located lateral and anterior to the neural
23 foramina; with no other disc protrusion or central canal
24 encroachment demonstrated. (A.R at 187.)

25 Dr. Robert G. Berry, Jr., and Dr. Alan Jakubowski reported
26 in 1998 that Plaintiff received three epidural steroid injections
27 for a back injury suffered in December 1997. (A.R. at 182-83,
28 189-90, 209-10, 213-14, 219-20.) In April 1998, Plaintiff

received physical therapy, (id., at 241, 246-48, 250-51),
medication (Vicodin and Flexeril), and restriction to light duty
with no lifting, bending, pushing, or pulling, with sitting or
standing as needed for comfort, (id. at 243, 249). In May and
June 1998 he was determined by Dr. Jakubowski, a physiatrist, to
be temporarily disabled based on lombosacral sprain and strain,
with L4-5 far lateral disc protrusion affecting the L5 nerve root
and degenerative disc disease at L2-3 and L3-4. (Id. at 232-38.)
Physical therapy continued. (Id. at 225-29.) He was released to
restricted work on July 7, 1998, and that status continued in
August 1998. (Id. at 222, 197.) Difficulty walking increased in
August 1998. (Id. at 207.) An EMG performed on September 25,
1998, revealed an abnormal study with electrodiagnostic evidence
supportive of an L5 lumbar radiculopathy in the left lower
extremity with no evidence of a peripheral compressive neuropathy
in the bilateral lower extremities. (Id. at 195-96.) In November
and December 1998, Dr. Virgil V. Becker examined Plaintiff and
confirmed a diagnosis of lumbar disc herniation, lumbar
radiculopathy, degenerative disc disease, and neurological
deficits greater than what one would expect to see in the setting
with a non-anatomical distribution for some of the problems.
(A.R. at 332-37.)

On March 1, 1999, Dr. Becker reported that with physical
therapy, Plaintiff's lifting capacity had improved, but he had
fallen and was suffering more pain. (A.R. at 324-25.) Plaintiff
did not want to discuss surgery or any other aggressive format of
treatment, and he wanted to return to his work as a merchandiser.
(A.R. at 324.)

8

On March 16, 1999, Plaintiff again stated to Dr. Becker that he did not want surgery despite continued pain for which he took occasional pain medication; he had a straight spine, normal gait and relatively stable function; his difficulty was lifting and carrying from the floor. (A.R. at 321.)

On March 18, 1999, Dr. James R. Rappaport wrote to an insurance company that Plaintiff was status post anterior lumbar interbody fusion two levels on March 8, 1999. On March 18, 1999, Plaintiff rated himself thirty per cent improved over his preoperative status; he had no leg pain, some right low back and groin pain, and his preoperative right leg pain had resolved completely. His left side pain was standard postoperative due to dissection along the genitofemoral nerve. (A.R. at 276-77.)[3] Plaintiff was prescribed a corset to support the surgical repair. (Id. at 253.)

On March 22, 1999, Dr. Becker reported that Plaintiff experienced severe discomfort over the weekend, revealed significant back and abdominal pain, and was referred to the emergency room with follow-up in a week. (A.R. at 320.) On March 29, 1999, Plaintiff reported having stopped physical therapy as of March 19 due to increased low back pain. However, he demonstrated increasing range of motion and fluidness of movements; his lifting capacity had declined after GI problems. Plaintiff wanted a vocational buy-out. Dr. Becker found tenderness and guarding in the lumbar spine, with increased forward flexion; he recommended continuing physical and

---

[3] This note is inconsistent with the other treatment notes from this period of time. The Court thus considers the inclusion of this letter in the record to be a mistake in the record.

occupational therapy. He expected medical stability for purposes of evaluation of capabilities within two weeks. (A.R. at 318-19.)

In April 1999, Dr. W. B. Jackson reported that a lumbar MRI study revealed degenerative disc disease with bulging discs at L2-3, L3-4, and L4-5, moderate spinal stenosis with slightly greater protrusion on the left with impingement upon the adjacent nerve roots with mild to moderate bilateral foraminal stenosis; moderate to severe dural sac stenosis at L3-4 with mild to moderate bilateral foraminal stenosis; and moderate dural sac stenosis at L4-5 with mild bilateral foraminal stenosis. There had been no significant change since May 1998. (A.R. at 255.)

Dr. Virgil V. Becker performed a left-sided L4-5 microscopic diskectomy and nerve root exploration and left-sided L3-4 microscopic exploration and decompression on May 26, 1999; the postoperative diagnosis was disk herniation, left side L4-5 with radiculopathy, with stenosis of 3-4, and degenerative disk disease at 3-4. (A.R. at 260-61.) In June, Dr. Becker reported that Plaintiff initially had back spasms and pain and difficulty walking fifteen feet; however, by June 23, 1999, he was walking a lot, feeling better, and demonstrating forward flexion with fingers four inches from the floor. (A.R. at 310.)

In July 1999, Plaintiff reported pelvic pain. Plaintiff was treated in the emergency room for severe neck and back pain from mild to moderate degenerative disc disease at L3 through L5; he was given Vicodin and Flexeril. (A.R. at 264-65.) By July 26, 1999, Plaintiff had a normal gait, less pain in the back, and was making gradual, slow improvement at physical therapy. Even though he had obtained extra Vicodin tablets from the emergency room, he

asked for more from Dr. Becker, who refused. Dr. Becker opined that it was certainly appropriate for Plaintiff to advance to computer work. (A.R. at 308.)

Plaintiff was again treated at the emergency room on August 3, 1999, for acute myofascial strain and severe back pain exacerbated by upright position and movement. Straight leg raising was negative; there were no apparent motor or sensory deficits, and reflexes were normal, but there was muscle spasm in the lower back. His medications were continued, and rest, heat, ice, and follow-up with his doctor were recommended. (A.R. at 269-71.)

Dr. James R. Rappaport reported on August 6, 1999, that Plaintiff was treated with physical therapy (exercises), and he reported thirty and forty per cent serial improvements in August with some aching but no radiating pain; he was not using pain medications any longer. Views of the lumbar spine showed implants in excellent position, disc space height well maintained at 4-5 and 5-l, and no evidence of migration or loosening; the incision was healing well, but abdominal musculature was weak. Further, Plaintiff had resumed smoking, which jeopardized the fusion and breached a pre-operative contract. He was directed to stop smoking, use a corset at all times, and to lift no more than ten pounds with no lumbar bending or twisting. (A.R. at 273-75.) After many months of therapy, he was discharged from physical therapy on August 26, 1999, to an independent program. (Id. at 278-300.)

Dr. Becker reported on September 13, 1999, that Plaintiff occasionally took Vicodin for soreness in his lumbosacral spine.

He was in mild distress, sat easily without restriction, guarding, or limitation, arose reasonably well from sitting to standing position and from flexed to neutral position, flexed forward within three inches of touching fingers to the floor, had a normal gait, and exhibited no crepitance or instability. Dr. Becker opined that Plaintiff was capable of lifting twenty pounds occasionally, twelve pounds frequently, sitting one hour at a time with occasional breaks, and bending only occasionally; he was permanent and stationary. (A.R. at 307.)

In October 1999, Dr. Becker examined Plaintiff, who arose very easily from sitting to standing, had normal gait, reported continued pain to his back and difficulty with walking, and was diagnosed with postop decompression of the lumbar spine with good relief of radicular pain. Dr. Becker found no follow-up to be necessary. (A.R. at 306.)

Dr. Bill J. Bailey, a chiropractor, examined Plaintiff and rendered a permanent partial disability evaluation on November 3, 1999. Plaintiff estimated his walking tolerance to be fifteen to twenty minutes, sitting thirty minutes, and he complained of constant low back pain at an intensity of four to eight on a scale of zero to ten dependent upon activity; rest reduced the pain but did not eliminate it. He took a muscle relaxer to relieve muscle spasms at bedtime. Examination revealed mild to moderate pain to palpation over the incision site and paraspinal muscles, but no trigger points; normal patellar and Achilles reflexes, non-dermatomal sensory deficit over the lower left leg, full motor strength in the lower extremities except 4/5 weakness in the left anterior tibialis and right extensor hallucis longus;

and three out of four positive Waddell's signs. Supine straight
leg raise caused pain, but sitting straight leg raise was
negative to ninety degrees bilaterally. The opinion was that
Plaintiff's impairment was stable, and the limitations set forth
by Dr. Becker would protect Plaintiff; Plaintiff had a ten per
cent whole-person impairment. (A.R. at 340-48.)

In February 2000, a respiratory therapist reported that
Plaintiff had been educated on the use of inhalers; Plaintiff
reported that he was a smoker and had smoked a pack of cigarettes
a day for twenty-two years. Nursing notes showed that Plaintiff
was prescribed Albuterol, 90 MCG 200D oral inhaler, to inhale two
puffs by mouth every four hours as needed. He was educated on
smoking cessation. (A.R. at 437-439.)

Dr. William Chow performed a consultative orthopedic
examination at the request of the department on June 3, 2000.
Plaintiff complained of low back pain radiating down the left leg
with associated weakness and numbness up the thigh. Plaintiff
reported he could walk 200 feet and lift and carry ten pounds. He
continued to take Vicodin and Ultram as well as Cyclobine.
Plaintiff was in no acute distress, had normal gait, could
perform toe, heel and tandem walking, and used no assistive
devices for ambulation. His lumbar spine range of motion was
reduced (flexion 70, extension, right and left bending at 10);
straight leg raising was positive bilaterally at ninety degrees
with pain in the left hip; and his lower extremities had normal
range of motion except for the hips, which were reduced. There
was no evidence of joint pain or inflammation, motor strength was
normal, and there was decreased pinprick and temperature sense in

the left posterior thigh above the knee. The impression was that the sensory findings in the left posterior thigh did not correspond to a specific dermatome. Dr. Chow opined that Plaintiff could carry twenty pounds from one-third to two-thirds of an eight-hour day; stand and walk for six hours with a break every two hours; sit without restrictions; and limitations on stooping and crouching, with no restrictions of the special senses. (A.R. at 349-53.)

On August 8, 2000, Dr. James B. Peery, a state medical consultant, completed a physical residual capacity assessment for the period from April 1998 through November 1999 based on a primary diagnosis of back injury, disc herniation L4-L5, spinal stenosis, lumbar radiculopathy, and status post L4-5 decompression and discectomy. (A.R. at 354-71.) Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand and/or walk at least two hours in an eight-hour workday, and sit with normal breaks for a total of less than about six hours in an eight-hour workday; engage in unlimited pushing and pulling; climb stairs occasionally but never ladders; and occasionally balance, stoop, kneel, crouch, and crawl. There were no manipulative, visual, communicative, or environmental limitations. (Id.)

On August 26, 2000, Plaintiff was treated as a VA outpatient for chest and upper arm pain experienced for two months during which he had taken Maxide for hypertension. He continued to smoke. He had cardiac enzyme evidence of myocardial necrosis, etiology uncertain; Plaintiff denied stimulant abuse. Renal insufficiency possibly due to chronic uncontrolled hypertension

was found, and tests were planned. On August 27, substance abuse was suspected; Plaintiff then admitted having used cocaine. (A.R. at 418, 424-27.) On August 29, 2005, the diagnosis upon discharge was acute myocardial infarction ruled out, chest pain secondary to cocaine vasospasm, cocaine substance abuse, hypertension, and chronic lower back pain. Plaintiff was prescribed Aspirin, Metoprolol, Cyclobenzaprine, and Vicodin. (A.R. at 420-22.) Plaintiff was counseled and educated regarding stopping cocaine use; Plaintiff said he would think about a detoxification program. (A.R. at 413.)

In October 2000, VA progress notes indicated that Plaintiff stated he was not using street drugs since being at the hospital, and his last tox screen was negative. He continued to use Vicodin for pain through November and December. (A.R. at 405, 407, 409.) Plaintiff failed to appear at radiology for UGI tests three times, so the UGI was cancelled. (A.R. at 408.)

VA progress notes revealed that his pain had decreased from an eight to a six from August 29, 2000, to January 1, 2001. (R.T. at 401.) His pain medications were refilled in February, March, and April 2001. (A.R. at 398-99.) Plaintiff complained of worsening pain in May 2001. (A.R. at 393-94.) He was also taking Ranitidine, and he declined to stop smoking. (A.R. at 393.) On May 17, 2001, a study of his lumbosacral spine showed degenerative changes at L3-L4 and L4-L5, including narrowing of the intervertebral disc spaces, and anterior osteophyte formation at L3-L4 with reactive changes at the adjacent bone surfaces. (A.R. at 392.)

On May 11, 2001, Dr. Ernest Wong, a state medical

15

consultant, completed a physical residual capacity assessment for the current time period based on a primary diagnosis of chronic low back pain, lumbar herniated nucleus pulposis, degenerative disc disease, and hypertension. (A.R. at 372-81.) Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; engage in unlimited pushing or pulling, frequently climb stairs, occasionally climb ladders, frequently balance, kneel, and crawl, and occasionally stoop and crouch; there were no manipulative, visual, communicative, or environmental limitations. He relied on the consultative report of June 2000 reporting gait, strength, flexion, and range of motion. Also, he concluded that Plaintiff was only partially credible because despite claiming he could walk only thirty feet, he said he could go out without assistance; further, he used only medications to control his pain. Dr. Wong commented that Plaintiffs hospitalization for chest pain was likely due to cocaine use, and that his hypertension did not meet or equal a listing. (Id.)

In June 2001 Plaintiff complained that his pain had not improved. (A.R. at 390.)

VA progress notes from June 2001, showed that Plaintiff tried to quit smoking; a two-question depression screen was performed and the results were positive. Plaintiff continued to take Vicodin, Aspirin, Carbamazepine, and Metoprolol. (A.R. at 505-07.) He started Gabapentin for neuropathy. (A.R. at 501.)

On July 6, 2001, Plaintiff was interviewed by Robert Emes, R.N., M.S.N., C.S., psychiatry Nurse Case Manager of the VA.

(A.R. at 384-89.) He had been referred by Dr. D'Morias for evaluation for treatment in connection with his history of PTSD, hypertension, and chronic low back pain at a level of eight. Plaintiff complained of flashbacks of combat during service, nightmares, lack of money, trying to see a psychiatrist for a year, stress, hypervigilance, dislike of crowds, no energy, depression, isolation, loss of interest, feeling sad, worthless, and guilty, increase and decrease in appetite with stable weight, and thoughts of death and suicide with a plan to overdose on pills. He had problems with concentration, making decisions, sleeping or sleeping too much, headaches, and impotence. He reported that he had been hospitalized in Reno in 1996 for depression and alcohol dependency for ten days, and then transferred to an Oregon facility for thirty days. He reported that he had threatened suicide when drunk in 1996. He drank a six-pack a day if he could get it; he last used cocaine in August 2000. He reported that he could groom himself, prepare his food, manage his money, drive, and take care of his safety. He had appropriate hygiene, attire, and eye contact; his speech was spontaneous, and his response friendly; his mood and affect were normal, although he stated that he was existing, not alive, and just taking up space. There were no illusions, hallucinations, delusions, or suicidal ideation; he expressed hopelessness. His thought processes were goal directed, he was oriented to time, place, person, and situation, and was not distractable; his general fund of knowledge was satisfactory. His insight and judgment were intact, and his impulse control was good. His mini mental state exam score was 29 out of 30. The nursing diagnosis

1  was mood disorder secondary to ongoing ethanol-alcohol

2  dependency, and he was referred to CDTP.[4] (Id.)

3      In July he took Zantac. (A.R. at 503.) In August 2001 he

4  renewed his Vicodin. (A.R. at 502.) In September 2001 he reported

5  his pain was down to an eight out of ten; his hypertension was

6  uncontrolled, so Maxide was added; and his radiculopathy was

7  controlled with Vicodin, Gabapentin, and Flexeril. Plaintiff

8  reported that he had not received much relief for his heartburn

9  and gas from the Ranitidine and OTC anti-gas medication; he had

10 occasional wheezing and planned to enroll in smoking cessation.

11 (A.R. at 498-99.) Dr. William J. Vlymen reported that an upper GI

12 radiological study taken on September 6, 2001, revealed normal

13 deglutition in the oropharynx; normal esophagus and stomach; and

14 unremarkable duodenal bulb, duodenum to the ligament of Treitz,

15 and small bowel. (A.R. at 494.)

16     On September 6, 2001, Dr. Evelyn Aquino-Caro completed a

17 psychiatric review technique covering the then-current period in

18 which she opined that Plaintiff's impairment of anxiety-related

19 disorders (noted as "PTSD?") and substance addiction disorders

20 (history of cocaine use) were not severe. Plaintiff was mildly

21 limited in activities of daily living and maintaining social

22 functioning; she found none to a mild degree of limitation

23 regarding difficulties in maintaining concentration, persistence,

24 or pace. The evidence in the file did not show recognition of a

25 severe disability, although it did show some mood problem and

26

27
    [4] This diagnosis was made by a nurse with a clinical specialty; pursuant to the governing California statutes,
28 such a professional does not constitute a psychologist. See Cal. Bus. and Prof. Code §§ 2838-2838.4, 2908,2911-2913, 2914.

alcohol use. The continuation sheet noted a history of inpatient rehabilitation in 1988 and 1996, abuse of alcohol and other drugs, and his referral to chemical dependency treatment upon diagnosis of mood disorder secondary to ongoing alcohol dependency in July 2001; his recent mental status exam was essentially normal, he initially made no psychological allegations, he had not received any consistent psychiatric treatment, and his physical treatment plans did not refer to any psychiatric symptoms, complaints, or observations. (A.R. at 440-56.)

On September 13, 2001, Dr. Brian Ginsburg, a state agency physician, reviewed all the evidence in the file and affirmed Dr. Wong's assessment of May 11, 2001. (A.R. at 379.)

In December 2001, Plaintiff continued his use of Vicodin. (A.R. at 495.) His pain was reduced to a seven. (A.R. at 491.) His hypertension medication was changed because he began skipping doses of Maxzide because of increased urinary frequency; he was given Chlorpheniramine for sinus congestion and Albuterol for reactive airway disease; he was given a smoking cessation handout. He indicated his pain was controlled to some extent with his medication. (A.R. at 489-90.) On December 31, 2001, he complained of increased lower back pain which had not been relieved by Vicodin and Cyclobenzeprine for ten days. (A.R. at 488.)

On January 3, 2002, Plaintiff's hypertension medication was increased. (A.R. at 487.) His blood pressure was still slightly elevated on February 1, 2002. (A.R. at 483.)

Plaintiff's medications continued in 2002. (A.R. at 460-

481.) In May 2002, Plaintiff reported that his PTSD symptoms related to combat experiences were more frequent; although he had been interviewed in 2001 about a year before, he did not get a follow-up. Plaintiff complained of depression, and he denied excessive alcohol or recreational drug use. (A.R. at 465.)

A myocardial image study taken on July 2, 2002, was normal; there was no evidence to suggest acute myocardial infarction. (A.R. at 459.)

SCOPE AND STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the

Commissioner's job, and not the Court's, to resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

<u>ANALYSIS</u>

I. <u>Disability</u>

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th

21

Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520 (1997);[5] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the

---

[5] All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

1  economy, 20 C.F.R. § 404.1520(f).

2      With respect to SSI, the five-step evaluation process is
3  essentially the same. See 20 C.F.R. § 416.920.

4      II. Bias of the ALJ

5      Plaintiff argues that the ALJ was biased on the basis of
6  asserted facts that are not reflected in the record before the
7  Court, including assertions that counsel for Plaintiff claims to
8  have one pending claim against the ALJ at the OGC office; the ALJ
9  approves only about twenty per cent of all claimants appearing
10 before him, whereas the national average is about sixty-three per
11 cent, and the average of visiting judges at this office is about
12 eighty per cent over the past several years; the ALJ has refused
13 to recuse himself when requested to do so (the particular
14 proceedings in question are not identified); and there are
15 innumerable examples of bias and/or misconduct given to the OGC
16 (but not enumerated or reflected in the record before the Court).
17 Plaintiff asks "you" (presumably the Court) to remand for full
18 inquiry and disclosure from the ALJ and other OHA staff and
19 contractors related to this claim, and other claims, so that bias
20 would be proven.

21     Plaintiff cites no legal authority with respect to bias. As
22 Defendant notes, quasi-judicial officers, such as administrative
23 law judges, are presumed to be unbiased, but the presumption may
24 be rebutted by a showing of conflict of interest or some other
25 specific reason for disqualification. Rollins v. Massanari, 261
26 F.3d 853, 857-58 (9th Cir. 2001) (holding that expressions of
27 impatience, annoyance, and even anger did not establish bias). In
28 order to establish bias, one must show that the ALJ's behavior,

1 in the context of the whole case, was so extreme as to display

2 clear inability to render fair judgment. Id. at 858 (quoting

3 Liteky v. United States, 510 US. 540, 555-56 (1994)).

4      Plaintiff's asserted proof does not amount to evidence; its

5 substance and context are not developed in the record.

6 Accordingly, the Court does not consider Plaintiff's extra-record

7 assertions to be established facts of evidentiary value in this

8 analysis.[6]

9      However, even if the Court were to accept Plaintiff's extra-

10 record assertion regarding the pendency (at an uncertain time) of

11 a claim by Plaintiff's counsel against the ALJ, this does not

12 establish bias. Cf. Bunnell v. Barnhart, 336 F.3d 1112, 1114 (9th

13 Cir. 2003) (holding that the standard of appearance of

14 impropriety is inapplicable to administrative law judges, who are

15 governed by regulations requiring actual bias, and further

16 holding that Plaintiff's counsel's having sued the ALJ in the

17 past did not demonstrate actual bias where a motion to recuse had

18 been denied).

19      Further, even if the Court were to accept Plaintiff's

20 counsel's extra-record assertions of a high statistical showing

21 of unfavorable rulings, this would not demonstrate bias. In re

22 Beverly Hills Bancorp, 752 F.2d 1334, 1340 (9th Cir. 1984).

23      In summary, the record here does not reveal any specific

24 basis for disqualification or any basis for a conclusion that the

25 ALJ was unable to render fair judgment. The Court rejects

26 Plaintiff's assertion that the ALJ was biased.

27

28      [6]Indeed, Plaintiff admits in the reply brief that the asserted general bias and bias against African Americans cannot be proven under current Ninth Circuit law.

III. <u>Rejection of Plaintiff's Subjective Complaints</u>

The ALJ noted that a determination of Plaintiff's RFC required consideration of Plaintiff's symptoms and pain, consistency thereof with the objective medical evidence, and various legal requirements; he recited Plaintiff's testimony that although he improved after his back surgery, he still experienced pain down his left leg to his knee with numbness on prolonged standing or walking. (A.R. at 19.) The ALJ noted Plaintiff's weekly use of ice packs and his use of a back brace; he recited Plaintiff's testimony regarding his capacity to stand for forty-five minutes, walk one hundred feet, and lift ten pounds. The ALJ also noted Plaintiff's activities of daily living, including reclining for five hours, washing dishes, sweeping and mopping twice weekly, vacuuming, and making the bed. (<u>Id.</u>) The ALJ then concluded:

> Overall, the nature, location, onset, duration, frequency, radiation and intensity of the claimant's alleged impairments are not corroborated by the record to the degree alleged. The claimant had surgery on his back and underwent numerous physical therapy sessions, but has not received treatment consistent with a chronic pain syndrome such as biofeedback, acupuncture, use of a TENS unit or attendance at a pain management clinic.

(<u>Id.</u>)

Plaintiff argues that the ALJ failed to review all pertinent factors, and he misrepresented the record in concluding that Plaintiff had not taken pain relief measures consistent with severe pain.

Once the claimant introduces medical evidence of an underlying impairment that could reasonably be expected to produce some degree of the subjective symptoms, the Commissioner

may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence such as objective medical findings. Id.; Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). Unless there is affirmative evidence tending to show that the claimant is malingering, the reasons for rejecting the claimant's testimony must be clear and convincing, and the ALJ must set forth the rejection by identifying what testimony is not credible and what evidence undermines the claimant's complaints. Lester v. Chater, 81 F.3d at 834. The findings of the adjudicator must be properly supported by the record and must be sufficiently specific to allow a reviewing court to conclude that the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony. Bunnell v. Sullivan, 947 F.2d 341, 345-46; Byrnes v. Shalala, 60 F.3d at 641-42 (9th Cir. 1995); see 20 C.F.R. § 404.1529(c) [disability] and 20 C.F.R. § 416.929(c) [supplemental security income].

Social Security Ruling 96-7p directs the adjudicator to consider not only objective medical evidence of signs, laboratory findings, and medical opinions, but also the following factors when assessing the credibility of an individual's statements:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and adverse side effects of any medication for pain or other symptoms;
5. Treatment, other than medication, for relief of pain or other symptoms;
6. Any measures other than treatment used by the individual to relieve the pain or other symptoms; and
7. Any other factors concerning the individual's functional limitations and restrictions due to

1    pain or other symptoms.

2 See also Bunnell v. Sullivan, 947 F.2d at 346.

3    The ALJ properly considered factors such as Plaintiff's

4 daily activities, whether his treatment was conservative, and

5 lack of objective medical findings. See A.R. at 19; Soc. Sec.

6 Ruling 96-7p and 20 C.F.R. §§ 404.1525c(4)(1)(viii),

7 416.929(c)(4)(1)(vii); Smolen v. Chater, 80 F.3d 1273, 1284 (9th

8 Cir. 1996); Bunnell v. Sullivan, 947 F.2d at 346 (9th Cir. 1991).

9 A claimant's ability to engage in activities of daily living to

10 the extent that he or she spends a substantial part of his day

11 engaged in pursuits involving the performance of physical

12 functions that are transferable to the work setting is relevant;

13 a specific finding as to this fact may be sufficient to discredit

14 a claimant's allegations. Morgan v. Commissioner of Social Sec.

15 Admin., 169 F.3d 595, 600 (9th Cir. 1999); Thomas v. Barnhart,

16 278 F.3d 947, 959 (9th Cir. 2002). Plaintiff himself testified

17 that he regularly engaged in activities constituting heavy

18 housecleaning as well as taking care of his personal grooming and

19 tasks such as washing dishes and making the bed. The ALJ properly

20 concluded that regular completion of these tasks was inconsistent

21 with the extent to which Plaintiff claimed disabling pain and

22 symptoms.

23    The ALJ was not required to believe the claimed extent of

24 Plaintiff's limitations.[7] An ALJ is generally entitled to rely on

25 the inconsistency of the medical record and Plaintiff's

26

27    [7] For the sake of brevity, the ALJ's rejection of Plaintiff's subjective claims regarding his mental

28 impairments is discussed more fully below in connection with review of the ALJ's conclusions regarding the severity of Plaintiff's mental impairments.

subjective complaints, Plaintiff's having been a poor historian, and any lack of candor on Plaintiff's part. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999). The ALJ noted Plaintiff's reclining and his weekly use of an ice pack; further, he noted Plaintiff's surgery and extensive physical therapy. He concluded, however, that Plaintiff had not received treatment consistent with chronic pain syndrome. The record supports this conclusion; Plaintiff claimed debilitating pain and yet after his surgery and for well over a year before the hearing did not seek treatment beyond drugs, rest, and ice. Although the record showed that Plaintiff obtained some treatment, it also supports the ALJ's conclusion that Plaintiff did not seek further treatment consistent with chronic pain, such as acupuncture, biofeedback, TENS, or attendance at a pain management clinic. Substantial evidence supports the ALJ's reasoning for rejecting the extent of subjective symptoms and limitations claimed by Plaintiff with respect to his pain and physical condition.

The Court concludes that the ALJ cited clear and convincing reasons for rejecting Plaintiff's subjective complaints of pain to the extent alleged, and that the ALJ's reasons were properly supported by the record and sufficiently specific to allow this Court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony.

IV. Statements of Others

Plaintiff argues that the assertions of other parties were not addressed, and thus the ALJ's opinion was inadequate.

28

1  Although Plaintiff does not state what these opinions are,

2  Plaintiff cites to pages in the record (A.R. at 157-58, 165-70)

3  on which appear a letter dated June 22, 2001, from Plaintiff's

4  wife, and a daily activities questionnaire from Jaine Blount, a

5  friend, completed and signed on July 23, 2001. Plaintiff does not

6  cite legal authority in support of this argument.

7       Title 20 C.F.R. § 1513(d)(4) (DIB) provides the following in

8  connection with evidence used to determine RFC:

> (d) *Other sources.* In addition to evidence from the
> acceptable medical sources listed in paragraph (a) of
> this section, we may also use evidence from other sources
> to show the severity of your impairment(s) and how it
> affects your ability to work. Other sources include,
> but are not limited to–
> ....
>      (4) Other non-medical sources (for example, spouses,
> parents and other caregivers, siblings, other relatives,
> friends, neighbors, and clergy).

Identical provisions are made with respect to adults in 20 C.F.R.

§ 416.913(d)(4) (SSI). Section 1513(e) (DIB) provides as follows

with respect to the completeness of the evidence:

> (e) *Completeness.* The evidence in your case record,
> including the medical evidence from acceptable medical
> sources (containing the clinical and laboratory findings)
> and other medical sources not listed in paragraph (a)
> of this section, information you give us about your
> medical condition(s) and how it affects you, and other
> evidence from other sources, must be complete and detailed
> enough to allow us to make a determination or decision
> about whether you are disabled or blind. It must allow us
> to determine–
>      1) The nature and severity of your impairment(s)
> for any period in question;
>      2) Whether the duration requirement. . . is met; and
>      3) Your residual functional capacity to do
> work-related physical and mental activities, when the
> evaluation steps described in §404.1520(e) or (f)(1)
> [ability to do past relevant work or any work] apply.

A provision identical in effect appears in § 416.913(e) (SSI).

The regulations further provide that it is the claimant's burden

to prove disability by furnishing "medical and other evidence,"
20 C.F.R. §§ 404.1512(a) (DIB), 416.912(a) (SSI); in §§
404.1512(b) (DIB) and 416.912(b) (SSI) "evidence" is defined as
including "anything [the claimant] or anyone else submits to us
or that we obtain that relates to [the claimant's] claim," which
includes but is not limited to:

> (3) Statements you or others make about your impairment(s),
> your restrictions, your daily activities, your efforts
> to work, or any other relevant statements you make to
> medical sources during the course of examination or
> treatment, or to us during interviews, on applications,
> in letters, and in testimony in our administrative
> proceedings;
> (4) Information from other sources, as described in
> § 404.1513(d) [and § 416.913(d)].

Thus, the pertinent regulations clearly include unsworn documents
in the nature of letters and daily activities questionnaires as
evidence to be considered for the purpose of establishing the
severity of impairments and RFC.

Further, Soc. Sec. Ruling 96-7p requires that because
symptoms may suggest a greater level of impairment than can be
shown by objective medical evidence alone, the adjudicator must
carefully consider the entire record, including statements and
other information provided by other persons about the symptoms
and how they affect the individual. (Id. at 1, 3.)

It is established that lay witnesses, such as friends or
family members in a position to observe a claimant's symptoms and
daily activities, are competent to testify to a claimant's
condition; the Commissioner will consider observations by non-
medical sources as to how an impairment affects a claimant's
ability to work. Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th
Cir. 1993). An ALJ cannot discount testimony from lay witnesses

1  without articulating specific reasons for doing so. Id. at 919.

2  In Dodrill, it was held that the matter required remand in part

3  because although the ALJ had expressly rejected lay evidence, the

4  ALJ had failed to give reasons germane to each witness for

5  rejecting the evidence. From the summary of the evidence from lay

6  sources in Dodrill, it is clear that one of the items of evidence

7  was a letter from a friend of twenty-five years. 12 F.3d at 918.

8  See also Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)

9  (finding it reversible error for the ALJ not either expressly to

10  reject the testimony of lay witnesses for legitimate reasons or

11  to include the physical manifestations in a hypothetical to a

12  vocational expert).

13       In the present case, the record contains a daily activities

14  questionnaire from Jaine Blount, a friend at whose garage

15  Plaintiff occasionally resided when he suffered anxiety; the

16  friend observed symptoms of distress, sleeplessness, immobility,

17  reduced activity, hyper-vigilance, grogginess from medication,

18  anxiety, and violence during nightmares. The form used was one

19  sent out by the SSA or other agency participating in the

20  evaluation. The letter from Plaintiff's wife is directed to the

21  state Department of Social Services; it details symptoms of rage,

22  nightmares, hyper-vigilance, hopelessness, suicidal thoughts and

23  statements, guilt, incoherence, low energy, lack of

24  concentration, drifting off to sleep, and impotence and inability

25  to care for himself as a result of heavy medications. She also

26  offers to provide additional information if needed.

27       Nowhere in the decision does the ALJ advert to this evidence

28  from other sources. The evidence is directly relevant to the

31

severity of Plaintiff's impairments and their effect on his

ability to work, and it also relates to determinations regarding

the validity of Plaintiff's subjective complaints.

Defendant argues that an ALJ "may discount" lay evidence

because it conflicts with medical evidence, and here the medical

evidence contradicted the statements about Plaintiff's alleged

psychiatric symptoms; further, because there was no evidence that

the friend was in a position to observe the activities described,

her competence as a witness could be doubted.[8]

These arguments amount to nothing more than assertions that

if the ALJ had wanted to, the ALJ could have found reasons in the

record for discounting this evidence. The problem is, however,

that the ALJ completely failed to make any finding regarding this

important evidence. It is true that once an ALJ expressly rejects

testimony of lay witnesses, the statement of arguably germane

reasons for dismissing the evidence will be found sufficient even

if not clearly linked to the determination. See Lewis v. Apfel,

236 F.3d 503, 511-12 (9th Cir. 2001). Here, however, review of

the ALJ's decision shows no reference to consideration or

evaluation of the lay evidence; there are no findings to review.

This Court is limited to reviewing the findings of the ALJ and to

reviewing the specific facts and reasons that the ALJ asserts.

Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (holding

that the ALJ's statement of what evidence was not credible and

what evidence suggested the lack of credibility sufficed as

specific findings or reasons for rejecting a claimant's

---

[8] The Court expresses no opinion on whether or not the record contains evidence from which the friend's opportunity and ability to perceive could be found to be present or lacking.

testimony, but holding that the mere presence of evidence in the record that would support an ALJ's conclusions, in the absence of the ALJ's discussion thereof, was insufficient). The district court cannot make findings for the ALJ. Id.

This being the case, the matter must be remanded for the ALJ to consider the lay evidence in connection with evaluating Plaintiff's subjective complaints and determining the severity of Plaintiff's impairments and Plaintiff's RFC, to make express findings supported by an adequate statement of reasons for the determinations regarding this evidence, to incorporate those findings in his decision, to undertake any further proceedings necessitated by those findings, and to reach a conclusion on the ultimate issue of Plaintiff's disability.

V. Propriety of the ALJ's Findings at Steps Two and Three and Failure to Develop the Mental Health Record

Plaintiff argues that the ALJ erred when he found that only Plaintiff's disc disease was severe; found that Plaintiff's depression and PTSD were non-severe despite a GAF of 40; failed to cite to evidence in making conclusions regarding steps two and three; and failed to review any specific listing despite counsel's argument that listing 1.04 was approached and Plaintiff's present assertions that Plaintiff can "Grid out" at rule 201.14, (Pltf.'s Op. Brf. at 3), and/or that Plaintiff is disabled under listing 12.04, (Pltf.'s Reply Brf. [lacking page numbers]).

A. Severity of Plaintiff's Depression and PTSD

The ALJ stated the following:

His post-traumatic stress disorder and substance abuse are slight impairments which have only minimal, if any,

> effect on his ability to work. The claimant has not had
> any psychiatric treatment on a consistent basis. The
> claimant's treating physicians do not make reference
> to any psychiatric symptoms, observations, or complaints
> (Exhibit 18F, p. 15). The claimant told consultative
> examiner Dr. Chow that he drank alcohol but did not
> quantify (Exhibit 13F, p. 2). In August 2000, the
> claimant was hospitalized for chest pain, which was found
> to be secondary to cocaine vasospasm for coronary artery
> disease (Exhibit 17F, pp. 31-47). On July 6, 2001,
> the claimant was diagnosed with mood disorder secondary
> to ongoing alcohol use (Exhibit 17F, p. 7).

(A.R. at 18.)

At step two, the Secretary considers if claimant has "an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) (DIB), 416.920(c) (SSI). This is referred to as the "severity" requirement and does not involve consideration of the claimant's age, education, or work experience. Id. The Secretary is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of [sufficient medical] severity." 42 U.S.C. § 1382c(a)(3)(F).

Basic work activities include the abilities and aptitudes necessary to do most jobs, such as physical functions of walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) (DIB), 416.921(b) (SSI).

1    An impairment or combination thereof is not severe when

2   medical evidence establishes only a slight abnormality or a

3   combination of slight abnormalities which would have no more than

4   a minimal effect on an individual's ability to work. An

5   impairment is not severe if it does not significantly limit a

6   claimant's physical or mental ability to do basic work

7   activities. 20 C.F.R. §§ 404.1521(a) (DIB), 416.921(a) (SSI);

8   Soc. Sec. Ruling 85-28; Smolen v. Chater, 80 F.3d 1273, 1289-90

9   (9th Cir. 1996).

10    Mental impairments are further evaluated with a special

11   psychiatric technique. 20 C.F.R. §§ 404.1520a (DIB), 416.920a

12   (SSI) (2002). The evaluation includes determination of the

13   presence of a medically determinable mental impairment, rating

14   the degree of functional limitations in activities of daily

15   living, social functioning, concentration, persistence, or pace,

16   and episodes of decompensation. Id.

17    Plaintiff cites to the fact that in 1996 Plaintiff had a GAF

18   of 40. (A.R. at 575 [service treatment plan report dated October

19   21, 1996, regarding Plaintiff's depression, PTSD, alcohol and

20   cocaine abuse, and pathological gambling].) However, this

21   evidence is stale, as it precedes the alleged period of

22   disability that began on April 14, 1998; further, as Defendant

23   notes, Plaintiff returned to work after this assessment and

24   performed substantial gainful activity through April 1998. (A.R.

25   at 38, 118.)

26    With respect to the pertinent evidence, the ALJ cited to the

27   psychiatric review technique by the state medical consultant,

28   which indicated that impairments of PTSD and substance addiction

disorder were not severe; any functional limitations were mild; and noted that there was some mood problem secondary to alcohol use which, it may be inferred, did not amount to an impairment. (A.R. at 18, 440-456.) In the absence of other evidence of a greater limitation, mild functional limitations generally support a finding that the impairment is not severe. 20 C.F.R. §§ 404.1520a(d)(1) (DIB), 416.920a(d)(1) (SSI) (2002).

However, the ALJ's reasoning for the finding of nonseverity, and the evidence relied upon in that reasoning, reveal serious problems with the adequacy of the disability determination process in this case and the sufficiency of the evidence relied upon by the ALJ.

The ALJ relied on the opinion of Dr. Aquino-Acaro, (A.R. at 440-56), who was a specialist, but who was a non-treating, non-examining state medical consultant. The Court is mindful that a non-examining expert's opinion can constitute substantial evidence. Further, the development of the case law of this circuit in regard to the sufficiency of a non-examining doctor's opinion has generally occurred in the context of rejection of a treating physician's opinion in favor of a non-examining doctor's opinion, and such a conflict is not presented in this instance. Nevertheless, it is established that sufficiency of the opinion of a non-examining doctor is premised upon the existence of other significant supportive evidence in the record. See, Lester v. Chater, 81 F.3d 821, 830-33 (9th Cir. 1995) (holding that in the absence of other evidence in the record, the opinion of a testifying, non-examining medical advisor was not sufficient to support the rejection of the treating physician's opinion, and

36

further was inadequate to support the opinion of an examining

psychologist, where the advisor's testimony was supported only by

a finding that the examining psychologist's opinion was obtained

for the purpose of litigation, an incorrect conclusion that the

psychologist's evaluation was irrelevant because it was made

after the expiration of insured status, and the conclusion that

the opinion was based on limited observation of the claimant,

which was an inadequate basis to reject, as distinct from give

less weight to, the opinion); Saelee v. Chater, 94 F.3d 520, 521-

22 (9th Cir. 1996) (holding that the opinion of a non-treating,

non-examining medical consultant was substantial evidence upon

which to reject the otherwise validly rejected opinion of a

treating doctor where there was other evidence in the record to

support the consultant's findings, including the consistent

opinions of other examining and consulting physicians, which in

turn were based on independent clinical findings); Andrews v.

Shalala, 53 F.3d 1035 1040-43 (9th Cir. 1995) (holding that the

opinion as to mental condition rendered by a testifying,

nonexamining medical advisor who had special expertise, had

observed the Plaintiff testify, and was subject to cross-

examination, accompanied by the ALJ's giving specific and

legitimate reasons for rejecting the opinion of a non-treating,

examining psychologist (including reasons why the findings of the

examining psychologist were suspect), was sufficient evidence

where it was supported by, and consistent with, other evidence in

the record (the opinions of four other non-examining mental

health professionals as well as Plaintiff's own testimony), even

though not supported by findings or opinions of an examining or

treating expert, and not based on independent clinical findings);
Morgan v. Commissioner, 169 F.3d 595, 600-03 (9th Cir. 1999)
(holding that the opinion of a testifying, nonexamining medical
advisor constituted substantial evidence supporting rejection of
the opinions of treating and examining mental health doctors
where the record also contained testimony of the claimant that
conflicted with the examining doctors' opinions, and where the
testing processes of the examining doctors were discounted, and
their reports were inconsistent); Magallanes v. Bowen, 881 F.2d
747, 750-54 (9th Cir. 1989) (holding that the opinion of a
testifying, non-treating, non-examining physician constituted
substantial evidence supporting the rejection of the testimony of
two treating physicians where it was consistent with other
evidence in the record, was not contradicted by all other
evidence in the record, was supported by the testimony of the
claimant, and relied on independent clinical findings made by
other examining physicians that differed from the findings of the
treating physician); Gallant v. Heckler, 753 F.2d 1450, 1452-56
(9th Cir. 1984) (holding that the reports of opinions of two non-
treating, non-examining physicians who based their conclusions on
review of submitted medical evidence were not substantial
evidence to support rejection of Plaintiff's testimony and
evidence from examining physicians where the non-examining
doctors' opinions were contradicted by all other evidence in the
record (including objective clinical evidence and subjective
complaints of the claimant) except for the ALJ's observations of
the claimant at the hearing); Pitzer v. Sullivan, 908 F.2d 502,
506 (9th Cir. 1990) (holding that the opinion of a non-examining

physician did not constitute substantial evidence sufficient to support the ALJ's rejection of the opinions of examining physicians where the record contained nothing that supported the opinion as to RFC).

Nevertheless, here the opinion of the non-examining psychological consultant was insufficient with respect to the nature and extent of Plaintiff's mental impairment or its severity. A non-examining medical consultant's opinion is evaluated using the same rules as opinions of other experts, including the supporting evidence in the case record, the supporting explanations provided by the physician or psychologist, and other relevant factors. 20 C.F.R. §§ 404.1527(f), 416.927(f). However, the opinions of physicians or psychologists who do not have a treatment relationship with the claimant are weighed by stricter standards, and are based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources. Soc. Sec. Ruling 96-6p at 2. For this reason, opinions of state agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record. Id.

Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of impairments, including symptoms, diagnosis, and prognosis, what the claimant can do despite impairments, and physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Acceptable medical sources who can provide evidence of an impairment include

licensed physicians, licensed or certified psychologists, and other practitioners not pertinent in the present case. 20 C.F.R. §§ 404.1513(a), 416.913(a). As to the severity of an impairment and its effect on ability to work, other medical sources may be consulted. 20 C.F.R. §§ 404.1513(d), 416.913(d).

Here, Dr. Aquino-Caro did not testify; she did not have an opportunity to observe Plaintiff and was not subject to cross-examination. The opinion of Dr. Aquino-Caro was based on the medical history, which, as summarized in the continuation sheet, appears to have been extremely brief and showed inpatient rehabilitation in 1988 and 1986, unspecified abuse of alcohol and cocaine, and the psychiatric intake examination in July 2001[9] that included a diagnosis of mood disorder secondary to ongoing alcohol abuse. (A.R. at 454-55.) Dr. Aquino-Caro expressly relied on the "recent" mental status examination (MSE). (A.R. at 455.) However, that MSE was performed by a nurse, not a psychiatrist or psychologist.[10]  Thus, a substantial portion of the very limited record of any currency upon which the non-examining specialist based her opinion was not evidence from an acceptable medical source. This is particularly troubling because this protocol involved a diagnosis and assessment of mental condition, which is acknowledged to be difficult and to involve personal impressions. See Morgan v. Commissioner, 169 F.3d at 605 (dis. op.). Psychiatric signs are medically demonstrable phenomena which

---

[9] It may be inferred that the July 2001 intake exam, which was based on a referral from October 2000, demonstrates at least a nine-month delay in the initial follow-up treatment within the VA system.

[10] The signature on the notes of July 6, 2001, is Robert Emes, RN, MSN, CS, Psychiatry Nurse Case Manager.

indicate specific abnormalities of behavior, affect, thought, memory, and orientation. 20 C.F.R. § 404.1528(b). They must also be shown by observable facts that can be medically described and evaluated. Id. Signs of mental illness are typically assessed by a psychiatrist or psychologist and/or documented by psychological tests. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(B). Professional skill and judgment, and not merely the noting and reporting of a person's statements, are required to evaluate the presence and severity of signs. Soc. Sec. Ruling 83-17. The fact that Dr. Aquino-Caro based her opinion on notes of an examination administered by someone who was not an acceptable medical source substantially undercuts the strength of the record evidence upon which the opinion of Dr. Aquino-Caro was based. Cf. Ghokassian v. Shalala, 41 F.3d 1300, 1302 (9th Cir. 1994) (finding insubstantial at best a non-examining consulting psychologist's opinion that was based on the hypothesis of a first year resident who did not possess a medical license and who examined the claimant, who spoke English poorly, without an interpreter).

Further examination of the opinion of Dr. Aquino-Caro reveals other inadequacies. It consisted substantially of entries on a check-off type form. The indication regarding medical disposition in connection with 12.06, anxiety-related disorders, was accompanied by a notation "PTSD?" (A.R. at 440.) It is clear that the doctor herself was unsure about a diagnosis. The indication accompanying the check-off of substance addiction disorders shows that it was based on the history set forth in the record. (Id.) There was no indication of any affective disorders or checking of any symptoms of depressive syndrome, or any

41

explanation of the absence of such indications, despite the Plaintiff's having reported many of the symptoms. The only symptoms, signs, or laboratory findings substantiating the presence of a substance addiction disorder was the history of cocaine use. (A.R. at 448.) The notes indicated that there was no evidence in the file recognizing severe psychiatric disability, although there was "some mood problem" secondary to alcohol use. Again, the nature of the mood problem was not described or explored in any detail. The doctor concluded that "non-severe seems appropriate per protocol." (A.R. at 452.)

The reasons stated by the analyst for the conclusion of nonseverity, with which the doctor concurred by indicating "Agree," (A.R. at 455), were that there were no psychiatric allegations at "initial"; history of "DAA" and reportedly PTSD; no psychiatric treatment on a consistent basis; prior hospitalizations for DAA purposes only; recent mental status exam was essential normal; no reference in physical treatment record to any psychological symptoms, observations, or complaints; and the medical evidence of record that had been received did not establish any disabling psychiatric condition. (Id.)

The Court notes that this assessment occurred almost a year before the hearing; thus, it necessarily failed to consider the increased intensity of PTSD symptoms reported by Plaintiff in May 2002 and at the hearing. (A.R. at 465, 48.) One important factor in evaluating an expert opinion is the extent to which an acceptable medical source is familiar with the other information in the case record; an opinion should be based on the Plaintiff's condition as a whole. 20 C.F.R. § 416.927(d)(6). Also, a more

recent opinion may in some circumstances be entitled to greater weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993). Thus, the limited basis for the opinion of the non-examining consultant is a matter of concern.

Further, the Court notes generally that the reasons given by both the state medical consultant and the ALJ for the assessment of the severity of Plaintiff's mental impairments pertain almost exclusively to a lack of evidence, as distinct from the presence of evidence, regarding Plaintiff's condition. The non-examining consultant's reasoning, which was adopted by the ALJ, (A.R. at 455, 18), included reliance on the fact that there was no psychiatric treatment on a consistent basis. Although the record in some limited sense supports this finding, a broader view of the entire record reveals evidence that the Plaintiff sought follow-up care for his PTSD symptoms after an intake interview, but he did not get follow-up. (A.R. at 465.) Plaintiff had some treatment for substance abuse (alcohol) in 1996, but it does not appear that he was treated for PTSD or any "mood problem." He explained his use of cocaine and alcohol as a method of self-medication that aided sleep, coping with nightmares, and PTSD symptoms. (A.R. at 49-50.)

An ALJ may rely on a claimant's inadequately explained failure to seek treatment or follow a prescribed course of treatment in rejecting a subjective complaint. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). However, in some circumstances the failure of a mentally disturbed individual to seek treatment does not suffice to support rejection of complaints or assessments of condition. See Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir.

1996). Further, it is established that failure to seek treatment
because of inability to pay is not a legitimate, let alone a
clear and convincing, reason for determining that a claimant is
not disabled. <u>Gamble v. Chater</u>, 68 F.3d 319, 321 (9th Cir. 1995).
Plaintiff here testified that he had repeatedly sought
psychiatric treatment for PTSD, could not afford it, and had to
wait in the VA program; he had not been given any medications
since 1996. (A.R. at 44-45.) The record substantially supports
this testimony and does not clearly contradict it. Under the
circumstances of the present case, the absence of treatment or
earlier allegations of mental disability are of little force.

Likewise, the failure to report psychiatric symptoms to
doctors who treated Plaintiff's considerable physical
impairments, relied on by the ALJ, (A.R. at 18), is of little
weight because of the very nature of the impairments for which
these physicians gave treatment to Plaintiff; it is not
reasonably anticipated that one would report psychiatric symptoms
to doctors whose area of practice does not include psychiatry.
Further, Plaintiff did complain of depression and PTSD, and
sought a consultation, during a routine clinical visit. (A.R. at
467.)

Turning to the ALJ's additional reasoning for finding no
severe mental impairment, the ALJ noted that the mood disorder
had been diagnosed as secondary to ongoing alcohol use. (A.R. at
18, 388.) Again, this was a nursing diagnosis not from an
acceptable medical source.

The ALJ appeared to rely on Plaintiff's lack of candor
regarding the quantity of alcohol consumed during the examination

by Dr. Chow and Plaintiff's use of cocaine. (A.R. at 18.)
Defendant argues that any alcoholism and/or substance abuse would
preclude a finding of disability if it was a contributing factor
material to finding disability, and Defendant cites to <u>Bustamante
v. Massanari</u>, 262 F.3d 949, 954 (9th Cir. 2001). It is not clear
how Plaintiff's failure to report the quantity of alcohol he used
to a consulting orthopedic doctor would serve as a reliable basis
for making a determination regarding the presence or severity of
a mental impairment; it is questionable whether it would even be
a clear, convincing, legitimate, or specific reason for making a
credibility finding. Further, in light of the absence of an
authoritative opinion regarding Plaintiff's mental condition at a
time pertinent to the period in question, it is premature to
consider whether Plaintiff's abuse of any substance was a
contributing factor material to a finding of disability.

In summary, the ALJ failed to articulate clear and
convincing reasons for rejecting Plaintiff's claims of subjective
symptoms concerning his mental health. Further, substantial
evidence did not support the conclusion that Plaintiff's mental
impairments were not severe.

## B. <u>Duty to Develop the Record of Plaintiff's Mental Condition</u>

The Court finds merit in Plaintiff's argument that the ALJ
failed to develop the record of Plaintiff's mental condition. The
law imposes a duty on the ALJ to develop a complete medical
record of at least the preceding twelve months in any case in
which a determination is made that the claimant is not under a
disability. 42 U.S.C. §§ 423(d)(5)(b) (DIB), § 1382c(a)(3)(H)(I)

(SSI). Regulations and case law define the duty to develop the record in some circumstances. 20 C.F.R. §§ 404.1512(d)-(f), 416.912(d)-(f) (recognizing a duty on the agency to develop a medical history, recontact medical sources, and arrange a consultative examination if the evidence received is inadequate for a determination of disability); Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) (recognizing the ALJ's duty fully and fairly to develop the record even if the claimant is represented by counsel). The duty arises when the record before the ALJ is ambiguous or inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001). There is a heightened duty where the claimant is suffering from a mental condition because mental claimants may not be able to protect themselves from loss of benefits by producing evidence. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

Although it was Plaintiff's burden to establish disability, the SSA is based on an investigatory model; its proceedings are inquisitorial and not adversarial in nature. The ALJ generally is obligated to investigate facts and develop arguments for and against granting benefits. Sims v. Apfel, 530 U.S. 103, 110-11 (2000). One way to supplement an inadequate medical record is to order a consultative examination, i.e., a physical or mental examination or test purchased for a claimant at the SSA's request and expense. 20 C.F.R. §§ 404.1519, 416.919. It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for the ALJ to make an informed decision. Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).

Here, although Plaintiff had counsel, he suffered from

mental impairments and was impoverished; he repeatedly sought treatment from a psychiatrist but was offered only treatment for substance abuse, which he himself described as self-medication for symptoms relating to PTSD and what appears to have been a mood disorder; his symptoms were corroborated by third parties, whose statements were not rejected by the ALJ; and the only current opinion of an acceptable medical source was that of a non-treating, non-examining state medical consultant whose opinion was given on the basis of a nurse's notes, lack of treatment, and lack of complaints made to physicians who treated or examined Plaintiff in connection with his serious physical impairment.

In light of the totality of circumstances in the present case, as demonstrated in the record as reviewed in the preceding analysis, the Court concludes that the matter must be remanded for the ALJ to develop the record of Plaintiff's mental condition, including but not limited to obtaining an opinion from an appropriate expert who is to examine the Plaintiff, to permit findings regarding the presence or absence of mental impairments, their severity, and any further appropriate analysis with respect to whether Plaintiff is disabled as a result of an impairment or combination of impairments.

In light of this conclusion, it is unnecessary for the Court to consider Plaintiff's assertion that Plaintiff met listing 12.04 (affective disorders).

### C. Listed Impairments

Plaintiff argues that the ALJ failed to review any specific listing despite counsel's argument that listing 1.04 was

47

approached and Plaintiff's present assertions that Plaintiff can

"Grid out" at rule 201.14, (Pltf.'s Op. Brf. at 3). In the reply

brief, Plaintiff argues that his spinal condition meets a

listing, but the listing referred to by number is 12.04, which

refers to affective disorders. Plaintiff's briefing is manifestly

unclear; however, the Court will proceed based on Plaintiff's

more specific references to the administrative record at 352, the

consultative orthopedic assessment of Dr. Chow on June 3, 2000,

regarding which Plaintiff argues as follows:

> ... because the evidence does support disability
> thereunder, e.g., on one report alone (Tr. 352) there
> is evidence of pain and positive SLR testing with decreased
> lumbar motion, reflexes, sensation. [And this
> is evidence from the CE who does not even fairly
> assess the RFC.] Plaintiff had lumbar surgery in 1999
> (Tr. 311, 312). He had continued radiographic evidence
> consistent with a vertebrogenic disorder. (Tr. 329, 330,
> 336.)

(Ptlf.'s reply brief, second page (pages not numbered).)

Plaintiff's contention is interpreted to be one regarding

Plaintiff's having met listing 1.04 (disorders of the spine).

The evidence to which Plaintiff cites includes 1) Dr.

Becker's initial evaluation of Plaintiff on November 17, 1998, in

which he recommended physical and occupational therapy, noted

that L4-5 level left disc protrusion and some disc degeneration

of L2-3 and L3-4 was shown on an MRI scan of May 11, 1998,

mentioned in an EMG report; noted x-rays showing mild to moderate

narrowing of the L3-4 disc space with anterior osteophyte

formation but no instability on the flexion view, no evidence of

spondylolysis or listhesis and no lytic or blastic defects; noted

an EMG and nerve conduction study of September 25, 1998, which

was supportive of left L5 lumbar radiculopathy to the lower

extremity without evidence of peripheral neuropathy, and recorded

a neurological exam of November 17, 1998, that revealed 5/5

bilateral motor strength to the hip abductors and adductors,

quadriceps, hamstrings anterior tibialis, flexors and extensor

hallucis longus, and the peroneals, although there was a mild

give-way on the left compared to the right; and noted decreased

sensation on the entire left leg without dermatomal distribution;

equal 2+ reflexes at the knees and ankles, plantar responses

downgoing bilaterally; and supine straight leg raise testing at

thirty degrees bilaterally caused back and leg pain (A.R. at

336); 2) Dr. Becker's letter to a worker's compensation nurse on

January 8, 1999, referring to an MRI scan of May 11, 1998, that

demonstrated disc protrusion at L4-5 level with significant

inflammatory changes with bone edema (A.R. at 330); 3) Dr.

Gilbert's report of SPECT imaging of the lumbar-sacral spine on

January 15, 1999, indicating mild increased activity involving

vertebral bodies at approximately L3-4 consistent with

degenerative disk disease, with no other significant focal

abnormalities (A.R. at 329); 4) Dr. Becker's notes from surgery

on May 26, 1999, revealing disc herniation, left side, L4-5 with

radiculopathy, degenerative disc disease and stenosis of 3-4;

surgery consisting of left-sided L4-5 microscopic diskectomy and

nerve root exploration, and left-sided L3-4 microscopic

exploration and decompression, with no evidence of residual

compression, (A.R. at 311-12); and 5) Dr. Chow's post-surgery

orthopedic report of June 3, 2000, revealing normal motor

strength; range of motion in the hips, knees, and feet all within

normal limits; decreased pinprick and temperature sense in the

left posterior thigh above the knee that did not correspond to a specific dermatome; bilateral reflexes of 1+; limited range of motion of the lumbar spine; positive straight leg raising at ninety degrees (supine or sitting form of not specified) with pain in the left hip; normal gait; and an impression that Plaintiff was "status post lumbar disk herniation, status post repair currently reports of back pain limiting mobility." (A.R. at 352).

It is Plaintiff's burden to establish that his impairment met a listing. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). Mere diagnosis of a listed impairment is not sufficient to sustain a finding of disability; there must also be the findings required in the listing. Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 416.925(d). Generally, specific medical findings are needed to support the diagnosis and the required level of severity. 20 C.F.R. §§ 404.1525(c)-(d), 416.925(c)-(d).

The Commissioner is not required to state why a claimant failed to satisfy every different section of the listing of impairments; rather, it is sufficient to evaluate the evidence upon which the ultimate factual conclusions are based. Otherwise, an undue burden would be put on the social security disability process. Gonzales v. Sullivan, 914 F.2d 1197, 1200-01 (9th Cir. 1990).

Listing 1.04(A)[11] concerns disorders of the spine (e.g.,

---

[11]Listing 1.04(B) requires spinal arachnoiditis and severe burning or dyesthesia; listing 1.04(C) requires stenosis resulting in pseudoclaudication and inability to ambulate effectively. Plaintiff does not contend that he suffered these symptoms.

herniated nucleus pulposus, spinal stenosis, degenerative disc
disease), resulting in the compromise of a nerve root or the
spinal cord, with evidence of nerve root compression
characterized by neuro-anatomic distribution of pain, limitation
of motion of the spine, motor loss (atrophy with associated
muscle weakness or muscle weakness accompanied by sensory or
reflex loss and, if there is involvement of the lower back,
positive straight-leg raising test (sitting and supine).
Plaintiff did show a diagnosis of disc herniation, degenerative
disc disease and radiculopathy, or disease of the nerve roots,
decreased sensation on the left leg; and decreased reflexes.
However, after surgery, Dr. Becker reported that there was no
evidence of residual compression of the nerves. There was no
showing of positive straight leg raising in both the seated and
supine position.[12] There was no documented motor loss (atrophy
with associated muscle weakness or muscle weakness). It did not
appear that there was a specific neuro-anatomic distribution of
symptoms and signs depending upon a specific compromised nerve
root.. (See 1.00(K)(1).)

The ALJ set forth the medical evidence at length, including
the opinions of Dr. Chow, Dr. Becker, and the state agency
physicians, and he expressly noted that the medical opinions
reflected judgments about the nature and severity of the
impairments as well as the resulting limitations. He expressly
stated that he found that the state agency opinions were
consistent with the medical evidence and the opinions of the

---

[12] The physical examination must include use of alternative testing methods to verify abnormal findings,
e.g., a seated straight-leg raising test in addition to a supine straight-leg raising test. 1.00(D)

consultative examiner, Dr. Chow, and the treating physician, Dr. Becker.[13] Dr. Peery expressly found that in October 2000, after Plaintiff's surgery, Plaintiff did not meet or equal the orthopedic listings. (A.R. at 371.) Relying on the medical history and Dr. Chow's report, Dr. Wong opined that Plaintiff could perform light work. It is concluded that the ALJ's findings that Plaintiff did not meet or equal a listing were sufficiently articulated and were supported by substantial evidence.

    VI. <u>Plaintiff's RFC</u>

    Plaintiff argues that the ALJ did not explain how he determined Plaintiff's RFC. He also argues that Dr. Becker's opinion mandated only one hour of sitting, dealt with only the work injury, and noted problems walking and the pendency of a subsequent RFC; Dr. Chow's opinion was "dated," was based on insufficient data to present a diagnosis, and did not consider data from 1996 regarding Plaintiff's mental health issues (A.R. at 575). (Pltf.'s Brief at 5.)

    Social Security regulations define residual functional capacity as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." <u>Reddick v. Chater</u>, 157 F.3d 715, 724 (9th Cir. 1998) (citing 20 C.F.R. 404, Subpt. P, App. 2 § 200.00(c) and <u>Lester v. Chater</u>, 81 F.3d 821, 833 (9th Cir. 1995)). The Commissioner must evaluate the claimant's "ability to work on a sustained basis." <u>Id.</u> (citing 20 C.F.R. § 404.1512(a)); <u>Lester</u>, 81 F.3d at 833); <u>see</u> 20 C.F.R. § 416.945. A "regular and

---

[13] To the extent that Plaintiff asserts that Dr. Becker's opinion was inconsistent with respect to Plaintiff's ability to engage in sitting, the contention is discussed in connection with Plaintiff's RFC.

continuing basis" means eight hours a day, five days a week, or an equivalent work schedule. S.S.R. 96-8p at 1, 2. The process involves an assessment of physical abilities and then of the nature and extent of physical limitations with respect to the ability to engage in work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Occasional symptom-free periods and even the sporadic ability to work are not inconsistent with disability. <u>Reddick v. Chater</u>, 157 F.3d at 724.

In assessing a claimant's RFC, it is necessary to consider the limiting effects of all the claimants impairments, even those that are not severe. 20 C.F.R. § 404.1545(a), (e); 20 C.F.R. § 416.945(a), (e); Soc. Sec. Ruling 96-8p at 4; <u>Reddick v. Chater</u>, 157 F. 3d 715, 724 (9th Cir. 1998) (failure to consider non-exertional factor of fatigue that could affect stamina); <u>Beecher v. Heckler</u>, 756 F.2d 693, 694-95 (9th Cir. 1985) (failure to consider a psychiatrist's report regarding a mental impairment). The ALJ must consider all factors that might have a significant impact on an individual's ability to work, including the side effects of medications as well as subjective evidence of pain; it is improper to focus on a single disease when other significant conditions exist. <u>Varney v. Secretary of HHS</u>, 846 F.2d 581, 585 (9th Cir.), relief modified, 859 F.2d 1396 (1988).

Because this case will be remanded for consideration of third party statements regarding Plaintiff's subjective claims as well as for development of the mental health record, it is possible that the RFC formulated by the ALJ upon remand will differ from that set forth in the decision under review in this proceeding. To the extent that Plaintiff's physical RFC may be

segregated from Plaintiff's mental RFC, the Court notes that it appears that the ALJ's conclusions regarding Plaintiff's physical RFC are supported by substantial evidence, namely, the opinions of the state agency medical consultants and Dr. Chow.

However, all of Plaintiff's impairments must be considered in formulating the RFC. Further, to the extent that the ALJ rejects the opinion of Plaintiff's treating physician, Dr. Becker (who found limitations on sitting), the ALJ's reasons for rejecting such opinion must expressly be set forth. The Court also notes that the ALJ did not mention res judicata in the opinion. Should res judicata play a part in that reasoning (as Defendant argues at pages 10 and 14 of its brief), the ALJ's findings and reasoning should be expressly set forth.

The ALJ is directed upon remand to consider all Plaintiff's impairments and all factors that might have a significant impact on his ability to work, to make all necessary findings, and to set forth all reasons in compliance with the pertinent legal standards.

VII. Past Relevant Work

The ALJ concluded that Plantiff could perform his past relevant work as a retail clerk. The ALJ relied on the testimony of the VE to the effect that Plaintiff's past relevant work as a retail clerk, as Plaintiff had performed it, was light, semi-skilled work. (A.R. at 20.) Plaintiff complains that the ALJ neither asked Plaintiff any questions about it and did not clarify the job under the Dictionary of Occupational Titles

(DOT).[14]

An adjudicator may consider the nature of a claimant's past occupation either as it was performed in the national economy or as the worker herself or himself performed it. <u>Pinto v. Massanari</u>, 249 F.3d 840, 845 (9th Cir. 2001); <u>Sanchez v. Secretary of Health and Human Services</u>, 812 F.2d 509, 511 (9th Cir. 1987); <u>Villa v. Heckler</u>, 797 F.2d 794, 796 (9th Cir. 1986).

Here, although the ALJ purported to rely on the testimony of the VE about the work of retail clerk, the decision is unclear based on what appears to be an indiscriminate use of job titles. In response to the VE's questions, Plaintiff testified that he worked as a retail clerk from 1991 through 1992 in the liquor department of a Phar-Mor, which was like a K-Mart. He restocked the cases and ran the cash register. (A.R. at 60.) The record shows that Plaintiff had described this position as "store clerk" in his work history report in August 2000 (regarding his prior application) as working at the cash register with very little lifting or carrying, lifting less than ten pounds. (A.R. at 135, 138.) In determining that the position was light, semi-skilled work, the VE appeared to characterize the job as "cashier/checker." (A.R. at 62.) The ALJ referred to two positions, both cashier-checker and retail clerk, whereas the VE testified only to the work level of the cashier-checker position. (A.R. 20, 62.) Although it appears that the VE was testifying to the work level of the store clerk position when he mentioned the cashier-checker position, this ambiguity should be corrected on

[14]All references to the DOT are to the <u>Dictionary of Occupational Titles</u>, fourth edition revised in 1991.

1  remand so that the basis of the ALJ's finding is clear.

2                              DISPOSITION

3       In summary, based on the foregoing, the Court concludes that

4  in conformity with the foregoing analysis, the ALJ's decision was

5  not supported by substantial evidence in the record as a whole

6  and was not based on proper legal standards.

7       When a court reverses an administrative agency

8  determination, the proper course, except in rare circumstances,

9  is to remand to the agency for additional investigation or

10 explanation. Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004)

11 (citing INS v. Ventura, 537 U.S. 12, 16 (2002)). It is not

12 necessary directly to order an award of benefits just because an

13 ALJ has failed to state adequate reasons for rejecting a

14 claimant's subjective claims. Connett v. Barnhart, 340 F.3d 871,

15 876 (9th Cir. 2003). However, in some exceptional circumstances

16 it is proper. Moisa v. Barnhart, 367 F.3d at 886-87.

17      In the instant case, it is clear that the ALJ failed not

18 only to state adequate reasons for rejecting some evidence, but

19 he also failed appropriately to develop the record, consider

20 evidence, and make and state findings regarding the evidence.

21 Because additional issues remain to be addressed, and further

22 because it is not clear that an award of benefits to Plaintiff

23 should result after the additional issues are addressed on

24 remand, the Court will order the matter remanded for development

25 of the record, further consideration of the evidence, and

26 entering of all necessary and appropriate findings with respect

27 to the applications for DIB and SSI pending before the Court.

28      Accordingly, it IS ORDERED that

                                 56

1. Plaintiff's social security complaint IS GRANTED, and

2. The matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration, consistent with this decision, of Plaintiff's status as disabled, including further development of the record concerning Plaintiff's mental condition, and consideration of a) whether or not Plaintiff suffered from a severe impairment or impairments, b) Plaintiff's RFC; c) whether Plaintiff could perform his past relevant work, and c) if appropriate, whether on the basis of the Plaintiff's age, education, work experience, and residual functional capacity, he could perform any other gainful and substantial work within the economy; and

3. Judgment BE ENTERED for Plaintiff James Lee and against Defendant Jo Anne B. Barnhart.


IT IS SO ORDERED.

**Dated:    September 20, 2005          /s/ Sandra M. Snyder**
icido3                                     UNITED STATES MAGISTRATE JUDGE